Next we'll hear SAMDEEN v. ASHCROFT This case has a long history of what could be termed persecution. I'm having trouble seeing why it's anything but family opposition to a marriage that was both a religious intermarriage and also a religious intermarriage. It's more than family, because when the young man especially visited the wife's family or village, it wasn't just the family, but the whole Buddhist group attacked them and threatened them. So the family motivates it, especially the uncle who has a working relationship with the police. It's a country the size of West Virginia. They've gone back there for vacations five times. The wife is now converted to Islam. Why can't they just live somewhere else in the country? Well, the Buddhists are the vast majority of the country, and the family or the clan would pretty quickly find out where these people are, and they would continue to be in danger. Is there any evidence of that in the record? I don't know if I can point to it. I believe that they testified to that, but, Your Honor, I can't point to it. I don't recall it. I was looking for it. But if you can maybe give us a page number in your rebuttal, it might be helpful. All right. Isn't the key problem that the petitioner has is that there really isn't any substantial evidence that the government was involved in this persecution? It was some uncle and some hearsay about some uncle who may have been the village enforcer. Well, government involvement is only a required element in the Convention Against Torture case. In that case, also, it can be acquiescence of the government so that if there should be protection, if the government should be able to do something about this and stands back, even in the Convention Against Torture case, there's a grounds for relief. In asylum and withholding, it doesn't require that the government be an actor. Now, it may be that government action is an important element where the issue of relocation arises because I believe it was Singh. Because the government was persecuting the Sikhs in India, the Ninth Circuit said if the government's an actor, we assume that no place – central government – there's no place in the country where the person would be safe. But not having an official government role in this doesn't keep it from being persecution. And, in fact, the uncle acts with impunity with the knowledge of the police, sometimes at the hint or behest of the police, and he kills people. The record seems quite clear about that. And so I think it would qualify even under the Church Convention where the acquiescence of the government is a required element. I don't think there's an issue as to it being a social group or a religion, persecution of religion or a social group. And so it meets the statutory elements of the persecution on account of one of the grounds. And definitely there has been injury and threats of death and threats of further injury if they return. The visits to Colombo were brief and very guarded. They didn't feel they could stay a long time. So there are other questions. I'll address them. Well, let me go back to the point you made about in a request for asylum, you're saying no governmental involvement must be shown. Yes, that's true. What about the Ernesto versus Navas case, NAVAS 217, Fed 3rd at 656, where the court held that mistreatment must be, quote, by the government or forces the government is either unable or unwilling to control, unquote? Well, if there were, if the government were able to control a gang or some group, then there would be no threat. But this is a situation where the government is unwilling to put any restraint on a dominant figure in a local clan. I don't think there was ever any evidence that anyone went to the government and asked them to. And although there's some explanation of that for this village, while the uncle was a big man in this village, there's no explanation at all that I can see for why they just couldn't settle in a different village or different town. I believe the explanation is that the Muslims are the smallest minority and they're discriminated against and they would have, it would be a futile effort and maybe a dangerous effort to try to get protection from the government. Well, that statement builds in several things. People who are in the smallest minority and who are discriminated against can still live safely without persecution in many countries. And often have had. The question is whether they face persecution that the government is unable or unwilling to protect them from or is itself the actor, the persecutor in no matter where they go in Sri Lanka. Well, the Muslims do live without constant persecution. But the wife here converted to Islam and this apostasy caused one of the nice things about Islam is once you convert to it, you're a real Muslim. Yes, but the Buddhists don't appreciate that. And her clan are very upset about it. Might be a good idea to live in a Muslim community if that's the way that the Buddhists feel. But there was no evidence that there are no such communities. What was there? Beg your pardon? No evidence that what? That there were no communities where they could live safely in Sri Lanka as Muslims. I'm sorry, I can't answer that accurately. Do you know how much the Muslim population is? I think it's around something like 2 percent. The Buddhists, the Sinhalese make up, I think, 70 or more percent. The Tamils make up about 20 percent. The Tamil Hindus. And then Muslims are a mixture of different racial or ethnic groups. I can think of ethnic groups in the United States that constitute approximately 2 percent of the population and used to be discriminated against, but are not and have not been persecuted in the United States. And what I'm trying to find out is, and who would have faced a great deal of hostility from families if there were intermarriage, and what I'm trying to find out is, is this analogous to that or is this a situation where these people just can't go back? Well, I believe that they definitely feel they can't go back. I'm sorry, I can't. They've gone back five times for vacations. The first time, the young man went back for a funeral. He did not go to see. He kept to himself, even though they were living in Abu Dhabi together. They were very guarded in their trips back. The longest trip was they spent two weeks in Colombo. They did not spend time in the village. They went there with bodyguards because of the fear they had. And they feared that if they stayed long enough, that's, I know that's in the testimony, if they stayed longer, they would be, their presence would be known to the family and they'd be in danger. I can't cite the record at the moment, I think, but that's the story. Do you want to save a moment in case you come up with that reference about why they can't live elsewhere? Thank you. Thank you, Counsel. Counsel. The government would stand on its brief other than to add that as properly determined by the agency and administrative proceedings below, nothing had happened to the petitioners in their native country of Sri Lanka, to bring them within the protective ambit of the Immigration and Nationality Act. And under the deferential standard of review, which I know this Court is familiar with, the evidence of record does not compel a contrary finding. Thus, accordingly, the board's decision should be affirmed and the petition for review should be denied. I have a question. Are we reviewing the I.J.'s decision or the board's decision? The board's decision. In this case, the board, this was not one of the streamlining cases in which the board affirmed without opinion. The board gave an opinion and indicated that, contrary to the petitioner's argument, that they noted the petitioner had indicated that, in their view, the immigration judge was saying under no circumstances could this type of activity from family members over intermarriage be persecution. And the government distinguished the two cases cited by the board. Well, you want to look at the administrative record, page 2, as long as we're reviewing the board. The board's petition is there. Have you got it? Page 2. Yes, I'm familiar with it. But I have it in front of you. I want to be sure you have it in front of you. And you see the last line on page 2 in the case before us? Yes. In the case before us, the government was not involved in any of the incidents. Now, that seems to me to be the basis of the board's decision. And it seems to be a clear misstatement of the law because the government doesn't have to be involved. It just has to be non-involved and non-helpful. And hasn't the board misstated the law in this case? Justice Kennedy, you're reading this out of context. No, I'm not. The following statement indicates. It's not a very long time. The following statement indicates that they were discussing the fact of whether or not they could relocate. And relocation within a country is dependent upon whether or not the persecution or the alleged persecution was from the government or a group that the government is unable or willing to control. Or, for example, when the persecution is from a terrorist group or guerrilla groups, then the petitions can relocate within the country, whereas if the persecution is from the government, they cannot relocate. That statement was in connection with the relocation. That's a nice effort to salvage. But look back in the very paragraph that this is written in, talking about context. Look at the second sentence of that paragraph where they're summarizing what the IJ did. He also found there was no involvement of the government in the respondents' problems. That's plural. So I would have thought that was the context. They tell you what the IJ decided, and then they give their own conclusions that the government was not involved. It refers to the whole ball of wax, and they've got the law screwed up. Have they not? No, I disagree with you on that. The government doesn't have to be involved in persecution, does it? No, it doesn't. All right. So they've got the law wrong. I don't agree. I don't think that's what the board said. The very next phrase says the respondents could safely and easily relocate within Sri Lanka. There are several conclusions there. Not involved with the respondents' problems. It's plural. And they do go on to the rule of relocation, and you're quite right. But they have failed to confront the persecution claim. And you know the regulation. If the persecution is proved, it's the services' burden to prove they can't relocate. It's not their burden. It's the services' burden. Do you understand that? But there's no persecution. There was never a persecution. You have to move to the second stage. You have to establish persecution. Yeah. So the board says no government involvement, no persecution. That's what the IJ found. They repeat it. And so they missed the problem of proof. The burden was on you, on the service, to prove persecution. Did you prove it? You proved you couldn't relocate. The relocation is after persecution is established. If persecution is established. No persecution was established. What happened here? The board got the law wrong on persecution. Do you concede that? No. I disagree with you on that, Judge Newman. Why? Because what happened, what the board found, affirming what the IJ found, what happened, interfamily disputes are not persecution. We're reviewing the board's decision. The board? The board agreed with the immigration judge. Well, I'm not going to try to argue with you, but you're not articulating anything I can lay hands on. Well, if this was De Novo Review, Judge Newman, then maybe this court would have the authority to. No, this is the law. This is not substantial evidence. They got the law wrong. If they get the law wrong, we send it back to them and say try again. I don't see where we got the law wrong on this. You don't. Unless you're saying you're making a finding that there was, per se, persecution in what happened to these individuals. We're not making findings. Based on the problems they had within their families. Excuse me, sir. That's not our job to make findings like that. We just have to get the law straight. The board gets the law wrong, we send it back. Judge Newman, you haven't shown me where the board got the law wrong. I told you twice. They say the government wasn't involved in the case, in the persecution. But I don't have to show you. It's just a matter of this Court deciding. But you haven't shown the contrary. With due respect, Judge Newman, the government does not agree with that position. If there are no further questions. I guess if they were stating it right, they would have said neither the government nor forces the government is either unable or unwilling to control. That is the law. And that's what they would have said if they were being precise and quoting exactly. Is that right? That's correct. Thank you, Counsel. Counsel, you saved the moment so you could speak to this relocation issue and whatever else. Yes. I found references to it, Your Honor, in their declarations, which are page 408 of the certified administrative record and page 414. That's pages 22 and 28 of the excerpts of the record. And the question is addressed again, but not quite precisely on page 187 of the administrative record or page 172 of the excerpts. In the first page cited, it's the husband's declaration. He says, once other Muslims found out my wife was Sinhalese, they would no longer accept me at the mosque. There's been trouble between the ethnic groups. Even if she's accepted as a Muslim because of the conversion, there's still ethnic problems between them. And the wife's declaration, after what happened in my village and what my friend told me about Sinhalese Muslim couples becoming targets in Colombo, he knew we could no longer stay in Sri Lanka. I'm sorry. I missed some words there. Could you read that again? What my friend told me about Sinhalese Muslim couples becoming targets even in Colombo, he knew we could never stay in Sri Lanka. It was too dangerous. That's on page 414. The issue is addressed not squarely. Are they talking about acceptance or about somebody doing something bad to them? I mean, acceptance, that's like a convert not being fully accepted in a church or synagogue. That doesn't rise to the level of persecution. People don't invite you over for cocktails or whatever. Is there evidence that they'd be persecuted? I can't put my finger on that, Your Honor. Sorry. May I address it? What I'm getting at is they could have a really unpleasant life of social isolation where nobody accepts them, nobody will invite their little girl over for birthday parties, people will insult them, but that can still not rise to the level of persecution. And what I'm trying to find out is, is there evidence in the record that they could not avoid persecution by relocating in Sri Lanka? I can't put my finger on it. May I have the opportunity for a letter brief on that? If we want further briefing, we'll issue an order. In fact, in the cited page on page 408, paragraph D in the declaration that you mentioned, it says, if we tried to settle down there, that is Sri Lanka, we would have problems as a mixed family. When there's trouble again between the Sinhalese and the Muslims, our family would be right in the middle. And then lower, lower down, they talk about they would no longer accept me at the mosque. If I died, there would be nobody to bury my body. So there's nothing in there about fear of persecution upon return, is there? Well, I believe the reference to the communal strife between Sinhalese and Muslims, if there's been a number of events that have been rioting, the most notorious was in 83 when there was a clash in Jaffna between the army and some local fellows who began a horrible, almost genocidal, rioting in the country in 83 against the Tamils. And so I believe they're afraid of that sort of tension erupting between the Sinhalese and the Muslims. Thank you, counsel. Sam Dean versus Ashcroft is submitted.
judges: Noonan, Kleinfeld, White